**Antonio A. DIAZ et al.,**

v.

**The SOUTHEASTERN DRILLING CO.
OF ARGENTINA, S.A., et al.**

**Civ. A. No. 3–1841.**

United States District Court,
N. D. Texas,
Dallas Division.

On Foreign Law Issues June 14, 1969.

On Motion to Dismiss or for Judgment
July 11, 1969.

1

Harvey Rosenberg, Silver Spring, Md., Donald Weinstein, New York City, Goldberg, Alexander & Baker, Dallas, Tex., for Diaz.

Farrell Smith, Corpus Christi, Tex., for Great American Inv. Co.

Garland Smith, Weslaco, Tex., for Trefina, AG.

Mark Martin, Dallas, Tex., for Southeastern Drilling Co.

## MEMORANDUM ON FOREIGN LAW ISSUES

BREWSTER, District Judge.

This is a suit against Southeastern Drilling Company, et al., for an accounting of the net profits realized from a contract between Southeastern and Yaciemientos Petroliferos Fiscales (YPF) for the drilling of 1500 oil wells in a government owned, proven field in Argentina. YPF was the agency of the Argentine government which had jurisdiction over that country's petroleum fields and activities.

By written agreements, Southeastern gave 20% of its net profits from such operation to Diaz, O'Neall and Dillin for their services in securing the contract. It was originally contemplated that the commission would be divided among those three persons as follows: Diaz, 10%; O'Neall, 5%; Dillin, 5%. However, Diaz had to assign some of his interest to other persons in Argentina, and wound up with only 4%.

The first drilling contract was so satisfactory that the parties decided to go after a second one. Diaz claims that O'Neall and Dillin each assigned him 1% of the net profits out of their respective interests to help take care of the expenses hereinafter explained. Diaz says that while such assignments gave him 6% of the profits insofar as Southeastern was concerned, they in fact resulted in a net equal interest of 4% each among O'Neall, Dillin and him, with his having an additional 2% to defray expenses.

O'Neall and Dillin have repudiated their respective assignments. O'Neall claims that he transferred all of his 5% interest to Trefina, A. G., a Swiss corporation. Dillin alleges that he sold his entire 5% to Great American Investment Corporation, a company organized under the laws of the Bahama Islands.

Diaz' claims to the two interests of 1% interest each from O'Neall and Dillin are based upon two written instruments, one signed by O'Neall and the other by Dillin. They were not executed at the same time and the wording of them is materially different.

Trefina challenges the claim of Diaz to the 1% interest he says he got from O'Neall, and insists that it owns all of the full 5% O'Neall had. Great American takes a similar position in regard to the 1% Diaz alleges he got from Dillin.

There is an argument over whether the law of Argentina applies to the instruments above mentioned, and, if so, what the pertinent Argentina law is.

The document signed by O'Neall which Diaz claims assigned a 1% interest to him is dated March 30, 1959, and reads as follows:

"TO WHOM IT MAY CONCERN

"KNOW ALL MEN BY THESE PRESENTS:

"That I, Charles F. O'Neall, hereby authorize and direct Southeastern Drilling Company of Argentina, S. A. (now in formation) to pay, from such sums as are payable to me, one (1%)

percent of the net profits realized by said company on the contract it now expects to obtain from Y.P.F. pursuant to Bid Invitation No. 10,338, to the order of Antonio Angel Diaz. Dated this 30th day of March, 1959, in Buenos Aires, Argentina.

/s/ Charles F. O'Neall

WITNESSETH: I, Antonio Diaz, do, this —— day of ——, hereby exercise the power specified above by directing that such payments be made to the order of ————.

/s/ Antonio Angel Diaz"

Trefina contends that this letter constituted only an authorization for a limited and conditional purpose which never materialized, that no consideration was ever paid therefor, that by said authorization O'Neall did not intend to convey any interest to plaintiff, and that it was timely cancelled and revoked.

Diaz testified that at the time this letter was executed, O'Neall signed an identical instrument on behalf of Dillin but that Diaz preferred to have such an instrument signed personally by Dillin and wrote him to that effect. Dillin did not comply with the request of Diaz, but, instead, drafted a letter containing different wording, which he mailed to Diaz in Buenos Aires. That letter, dated July 8, 1959, reads as follows:

"Dear Antonio:

"Reference is made to the Commission Agreement dated February 1959, between Southeastern Drilling Company, represented by Mr. Clements as president, the Houston Brothers, O'Neall, yourself, and me. As you will recall, that agreement provides that I am to receive five (5%) per cent of the net profits, if any, from the contracts contemplated thereby.

"I also refer to previous conversations and agreements reached between you, O'Neall, and myself with respect to the special use to be made of twenty (20%) per cent of my commission, namely one (1%) per cent out of the five (5%) per cent.

"This letter constitutes written confirmation of my agreement and constitutes your authorization to collect on my behalf one-fifth of the five (5%) per cent commission payable to me under the Southeastern agreement for the purposes we have agreed to.

"In order to be sure you will receive this confirmation promptly I am sending a carbon copy to your hotel in New York, with the original being mailed to your office in Bueros Aires.

"Sincerely yours,

"/s/ W. N. Dillin"

Great American argues that this letter constituted merely an authorization in the nature of an agency, not coupled with any transfer of interest in the property thereof. It asserts that it was timely revoked, that no personal benefit for Diaz was intended by it, that no consideration was paid, and that there was a conditional purpose which was never completed.

The evidence shows that on September 17, 1959, Southeastern paid an advance "signing bonus" to each of the parties entitled to a percentage of the net profit under the February agreement. On the same date, O'Neall and Dillin each wrote checks to Diaz for amounts equalling 1% of the total advance payment.

Diaz argues that the two per cent was assigned to him by these letters in exchange for personal expenses he had incurred in connection with the drilling contract and for expenses which he contemplated in the future to secure a second contract for Southeastern for an additional number of wells. He argues that the payments of September 17, 1959 should be interpreted as a ratification or confirmation of these instruments as assignments.

■ The substantive rights of the parties are to be governed by the laws of Texas, including its choice of law rules. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 317, 82 L.Ed. 1188 (1937); Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85

L.Ed. 1477 (1941); Maryland Cas. Co. v. Williams, 5 Cir., 377 F.2d 389 (1967).

█ Under Texas conflict of laws rules, the validity, interpretation and effect of an assignment, and of contracts generally, are determined by the law of the place where the contract is made. Burtis v. Butler Bros., Tex.Civ.App., 228 S.W.2d 938; Bernard Gloeckler Co. v. Baker Co., Tex.Civ.App., 52 S.W.2d 912. Under Texas law, a contract is generally held to be made at the place where the offer is accepted. Lone Star Gas Co. v. Coastal States Gas Producing Co., Tex. Civ.App., 388 S.W.2d 251; National Life Co. v. Wolverton, Tex.Civ.App., 163 S. W.2d 654; Wood Motor Co. v. Hawkins, Tex.Civ.App., 226 S.W.2d 487. Even under the trend toward application of the law of the place having the most significant relationship to a case, it is clear that the law of Argentina would be applicable.

The evidence shows that the debtor, Southeastern Drilling Company, is a Panama corporation which was formed for the sole purpose of performing this drilling contract in Argentina. The commission contract of February 13, 1959, for services rendered in Argentina, was entered into by all parties in Buenos Aires. The alleged assignee, Diaz, is domiciled in Argentina. The letter from O'Neall was drafted and signed by him in Buenos Aires and was received and accepted there by Diaz. The Dillin letter was drafted and signed by him in Washington, D.C., but it was received and accepted by Diaz in Buenos Aires. The only connections which the State of Texas has had with these transactions were insignificant. For example, the payments of September 17, 1959 were made to Diaz by O'Neall and Dillin in Corpus Christi; the balance of the money associated with the claimed assignments is on deposit in a Dallas bank; and an office of Southeastern Drilling Company is located at Dallas. The State of Texas has had no contact with the assignments and there is no evidence that Diaz, O'Neall or Dillin negotiated with reference to Texas law. Argentine law controls the issues presented here.

█ A major portion of the trial was devoted to the introduction of evidence to prove the applicable laws of Argentina, including the testimony of three witnesses offered as experts on Argentine law and designated articles from the Argentine Civil Code (Joannini Translation) published by the Comparative Law Bureau of the American Bar Association (Boston Book Company, 1917). The determination of Argentine law is a question of law on which the Court may consider any relevant material or source. Rule 44.1, Federal Rules of Civil Procedure.

Professor Julio Lezana, Professor of Law at the University of Buenos Aires, the largest university in Argentina, testified for plaintiff with respect to the effect of the March 30, 1959 letter. He stated that he received his equivalent of an L.L.B. degree in 1924 and his doctorate degree in Jurisprudence in 1932; that he began the practice of law in 1924; and that he has been a professor at the University since 1956. He testified that he had written many articles for legal publications and that he is a member of the Law Institute of Buenos Aires, a doctoral program specializing in Civil Law.

The Professor stated that a power, referred to in the Argentine Civil Code as a *"mandate"* exists "when one person is authorized to act on behalf of and under directions of another person, in accordance with the instructions given."[1] He stated that an assignment, called a succession of credits in Argentina, exists "when the credit is assigned to another person and that person can dispose of it freely."[2] As explained by the Professor, a mandate may be gratuitous or onerous, and it will be presumed gratuitous in the absence of a stipulation that the *mandatary*, the recipient of the power, is to receive compensation for his

---

1. Art. 1869.

2. Arts. 1434, 1444, 1448, 1454, 1460.

work.[3] He further stated that a *mandate* is revocable by the principal, provided that it has been given only in the interest of one party.[4]

(All citations in the footnotes refer to articles in the Argentine Civil Code)

Professor Lezana concluded that the O'Neall letter was not a power or *mandate* because "it does not state that Mr. Diaz has to do anything with reference to Mr. O'Neall", whereas a *mandatary* is one who acts "on behalf of the principal generally following his instructions."

The Professor was of the opinion that the portion of the instrument above the signature of O'Neall itself constituted a valid assignment in favor of Diaz, perfected at the moment at which it was accepted by Diaz, and that it was ratified by the second part of the document which showed, by the words "to the order of," that Diaz could do anything with that part of the profit which was assigned to him. Professor Lezana explained that blank spaces were common in the business world in Argentina in commercial transactions and that Diaz could put any name there, even his own.[5]

As to the requirement of consideration for a contract under Argentine law, the Professor pointed out that if it were not expressed, Article 1016 of the Civil Code would "suppose" that it existed.[6] The contract, as an assignment, would not be revocable by one party, but would require consent of both parties for its modification or cancellation.[7]

If the parties were unable to agree upon the terms of a contract in Argentina or if the terms were ambiguous, the Professor testified that the issue would be for the judge to determine by attempting to locate the intent of the parties from the contract or from their conduct, such as payment, under its provisions.

Great American offered the testimony of Harry Wright, a Professor of Law at the University of Texas School of Law, on the issue of the application of Argentine law to the letter of July 8, 1959. Professor Wright holds a Bachelor of Science degree in Foreign Service from the School of Foreign Service at Georgetown University and received his L.L.B. in 1952 from the University of Texas where he was Editor-in-Chief of the Texas Law Review. Following his graduation from law school, he served in the Army for a year and a half, some of which time was spent in Puerto Rico. He engaged in private practice for 10 years, including 5 years with a law firm in Mexico City and 5 years with a Houston, Texas firm. He has been a Professor of Law for about six years at the University of Texas Law School, where he teaches Civil Law and Latin American Law with emphasis on Argentine and Mexican law. From time to time, he also teaches such courses as Latin American Commercial Law and International Business Transactions.

Professor Wright testified that the letter of July 8, 1959 fit squarely into the definition of a *mandate* and clearly indicated on its face that it was to be this type of contract. He pointed out that the language of the letter, "Your authorization to collect on my behalf", contained all the essential elements of a *mandate*—(1) a power, (2) to represent the principal in the execution of some act, and (3) in the name and for the account of the principal. Professor Wright pointed out that under the Argentine Code, *mandates* may be general or special [8] and that a special *mandate* must be limited to the act or acts for which it is given.[9] He concluded that since the letter conferred authority for only one transaction, it was a special *mandate* and that the authority of Diaz

3. Art. 1871.

4. Arts. 1963(1), 1970, 1977.

5. Art. 1016.

6. Arts. 500, 501.

7. Arts. 1200, 1197.

8. Art. 1879.

9. Art. 1884.

was limited to that act. The witness testified that the authority given was further limited by the express statement that the debt was to be collected "for the purposes we have agreed to," and that this limitation could not be exceeded under Article 1905 of the Civil Code,[10] and that if any amounts were collected by Diaz for purposes other than that for which the authority had been granted, Diaz would be obligated to account for it to Dillin.[11]

Professor Wright found no words in the letter of July 8 indicating an assignment and thought that the letter seemed expressly to negate any intention to make an unconditional transfer of ownership in the claim.[12] He felt that the payment of September 17, 1959 could not be interpreted as a "confirmation" that the letter was an assignment under Article 1059.[13] He explained that "confirmation" was an act which removed or waived a defect in a transaction, that there was no evidence of any such defect in the letter, and, further, that confirmation could not be made until the defect, such as minority of a party, had ceased to exist.[14] On the other hand, he was of the opinion that the payment would be entirely consistent with and would, in fact, strengthen the construction of the letter as a *mandate*, since the principal must advance amounts to the *mandatary* which are necessary for the performance of this *mandate* and if the *mandatary* has advanced them the prin-

cipal must repay him.[15] Thus, the payment could be viewed as an advance or repayment of amounts advanced in performance of the *mandate*.

Finally, the Professor noted that under the interpretation of the letter as a *mandate* the authorization could be revoked at any time by Dillin and at his will.[16]

The Court is of the opinion that the credentials and reliability of these witnesses as experts were established beyond dispute and that the testimony given by each of them should be accepted. From their testimony and the excerpts from the Argentine Civil Code introduced into evidence, together with other evidence offered on these issues, the Court concludes: (1) that the letter of March 30, 1959, from Charles F. O'Neall to Antonio A. Diaz constitutes a valid assignment under Argentine law; and (2) that the letter of July 8, 1959, from Wm. N. Dillin to Diaz is not an assignment but is a revocable power or *"mandate"*.

The evidence shows O'Neall was a successful attorney. If he intended the instrument prepared by him to have the effect of a power, he failed to indicate that intention in any manner. On the other hand, the refusal of Dillin, also a lawyer, to sign an identical letter, and his insistence upon drawing up an entirely different instrument established to the satisfaction of the Court that he was seeking to avoid a construction such

---

10. "He (the agent) must confine himself to the limits of his power. * * *" Art. 1905.

11. "A *mandatary* is obliged to render an account of his transactions, and turn over to the principal whatever he has received under the mandate. * * *" Art. 1909. "The obligation of the *mandatary* to deliver what he has received under the mandate, includes * * * everything which he has received from a third person, even though he received it without a right thereto. * * *" Art. 1911.

12. Art. 1434, supra, note 2.

13. Art. 1059.

14. Art. 1060.

15. "The principal must advance to the *mandatary*, if he so requests, the amounts necessary for the performance of the mandate." Art. 1948. "If the *mandatary* advanced them, the principal must repay the sums to him. * * *" Art. 1949. "A *mandatary* is not required to await the presentation of his accounts, or the entire fulfillment of the *mandate* in order to demand payment of the advances or expenses made or incurred by him." Art. 1955.

16. Art. 1963, supra, note 4; Art. 1970, supra, note 4; Art. 1972; Art. 1966, supra, note 4.

as has been placed upon O'Neall's letter; and it is the opinion of the Court that he succeeded.

## MEMORANDUM ON TREFINA'S MOTION TO DISMISS OR FOR JUDGMENT

After the verdict of the jury was returned, Trefina filed a motion to dismiss or for judgment. The motion to dismiss is on the ground that O'Neall and Dillin were indispensable parties. The motion for judgment is based upon the contention that the Court should have instructed a verdict in favor of Trefina. Those two matters and Trefina's complaint about the general conduct of the trial will be discussed in this memorandum.

### Indispensable Parties

Trefina now claims that this action should be dismissed because O'Neall, its alleged assignor, is an indispensable party. Trefina claimed otherwise until after the jury returned a verdict unfavorable to it.

■ Trefina is estopped to assert that O'Neall is an indispensable party because it successfully induced the Court at the pre-trial hearing on January 10, 1968, to overrule a motion by Diaz to the effect that the interventions of Trefina should be dismissed because O'Neall was not a party hereto. Trefina's argument at that time was that it had a valid, genuine assignment from O'Neall of all his interests in the commission involved in this action, and that, as such an assignor, he was not an indispensable party.

The following is quoted from the Brief in Support of Trefina's Motion to Dismiss or for Judgment on file herein:

"Additional Actions Taken by the Court: At the pretrial held on January 10, 1968, in Abilene, Texas: * * * (b) Diaz Motion to Dismiss as to Trefina and Great American for failure to join unnamed indispensable parties, who were identified at the hearing orally as O'Neall and Dillin, was denied. * * *"

"Trefina's position is now, as it was in the beginning, that O'Neall is neither a necessary, indispensable, or proper party to the proceedings against Southeastern or Diaz. * * *"

As a result of the arguments of Trefina and Great American, the Court overruled Diaz' motion based on the indispensability of O'Neall and Dillin. At the same time, it suggested that counsel for Trefina and Great American should try to get disclaimers from O'Neall and Dillin and file them so as to take the question out of the case.

One such instrument purporting to be a disclaimer from Dillin was filed. It was full of loopholes, and bore little resemblance to a disclaimer.

■ No rule is better settled than the one that: "A party who assumes and successfully maintains a certain position in a judicial proceeding cannot thereafter adopt an inconsistent position if doing so would result in prejudice to his adversary. * * *" 22 Tex.Jur., p. 685; Jamison v. Garrett, 92 U.S.App.D. C. 232, 205 F.2d 15 (1953); Lummus Co. v. Commonwealth Oil Ref. Co., 1 Cir., 280 F.2d 915 (1960); Roth v. McAllister Bros., Inc., 2 Cir., 316 F.2d 143 (1963); National Utility Service, Inc. v. Whirlpool Corp., 2 Cir., 325 F.2d 779 (1963); Jones v. Central of Georgia Ry. Co., 5 Cir., 331 F.2d 649 (1964).

As a result of the position taken by Trefina and Great American on this question and the Court's order in accordance therewith, Diaz made a trip from Argentina to Texas for this trial. He was in Dallas almost ten days. He was put to the expense of bringing Dr. Lezana from Buenos Aires as a witness on Argentine law, and of bringing lawyers from New York and Washington to work with Dallas lawyers in the trial of the case.

Trefina and Great American maintained throughout the trial that their respective assignments from O'Neall and Dillin were valid. If they were, O'Neall

and Dillin were not indispensable parties.

It was after hearing all the evidence in the case that the Court ordered them made parties to the further proceedings in connection with Southeastern and the Internal Revenue Service. No one with the intelligence of an oyster could have followed the proceedings in this case down to the time, after the trial, that the Court acted on the motion of the I. R.S. for leave to intervene, without having some serious reservations about the genuineness of those assignments. The fact that Trefina and Great American had tried to make it appear that there was no question about such genuineness, and had failed, does not put them in position to come in now and say that the Court should undo the trial, held at their urging without O'Neall and Dillin, at great expense and inconvenience to Diaz.

If any action were going to be taken on account of the fact that O'Neall was not a party to this action at the time of the trial, the appropriate one would be to dismiss Trefina's intervention.

Trefina's motion to dismiss is overruled.

### Motion for Judgment

A detailed consideration of this contention would require a discussion of all the evidence. That is not necessary at this point. The special interrogatories submitted to the jury show the fact issues the Court thought were in the case, and the Court is of the opinion that judgment should be rendered on the jury verdict.

### The Court's Conduct of the Trial

Trefina's complaint about the Court's conduct of the trial is summarized in the following language in its brief in support of this motion:

"At an opening conference between the Court and counsel, the Court advised counsel for Trefina and Great American, in the presence of other counsel, that it was 'unfortunate that you have drawn me for a judge,' and shortly thereafter, in a similar conference, the Court referred ominously to 'skulduggery in this case,' and instructed counsel for Trefina and Great American that he would have something to say to them about this matter immediately upon the conclusion of the case. It was under the pressure of this openly hostile attitude of the Court that counsel for Trefina proceeded to trial in the matter, and at the conclusion of the testimony, the Judge of the Court gave the charge to the jury which Trefina contends included unfair comments on the weight of the evidence, which were highly prejudicial to Trefina, and unfairly beneficial to Diaz, and of such a nature as to deny the jury the free exercise of their judgment, and to thereby deny Trefina its constitutional right to a trial of the facts by an impartial jury."

Trefina neglects to say that the remarks quoted occurred out of the presence of the jury, and that the Court stated that he might change his mind when he heard all the evidence.[1] They were made during the noon hour on the first day of the second week of the trial. Trefina lifts them out of context from a trial that lasted more than a week, and presents them as if they should be considered in a vacuum. When they are taken for what they really meant, along with the record as a whole, it is evident that all parties got a fair trial.

The statements complained of should be considered in the light of the following:

(1) O'Neall and Dillin, along with Diaz and others, had made a large commission out of getting Southeastern Drilling Company a contract from the Argentine government to drill 1,000 oil wells. Their agreement with Southeast-

---

1. "* * * I have not heard all the evidence yet, and maybe I will change my mind when I hear all of it; but right now I have in mind that I have seen more skullduggery in this one case than I have seen in all the rest of the cases I have been in for nearly forty years in the courtroom. * * *"

ern was that they were to get a total commission of 20% of the net profit. It was originally contemplated that the 20% commission would be divided among them as follows: O'Neall and Dillin 5% each, and Diaz 10%. Diaz had to give up 6% of his to associates in Argentina, so he had only 4% left. O'Neall and Dillin have already received checks from Southeastern totalling $672,800.00 each, with much more still to come. It was agreed that each of the 1% interests in issue in this trial was worth around $190,000.00.

(2) Diaz claims that in the early stages of Southeastern's Drilling operations in Argentina, O'Neall made a written assignment to him of a 1% interest in the net profits of the deal, and that Dillin made a similar assignment of a like interest. Diaz claims that such assignments were made to reimburse him for expenses he had been out in negotiating the deal between the Argentine government and Southeastern and that he would be out in another oil well drilling deal he, O'Neall and Dillin were trying to put over with the same government.

(3) This suit was instituted by Diaz asserting that he owned a 6% interest (4% under original contract plus the later acquired 1% from O'Neall and 1% from Dillin) in the net profits realized from the drilling deal, and asking for an accounting from Southeastern.

(4) The parties who showed up to contest Diaz' claim to the later acquired 1% interests were not O'Neall and Dillin, but Trefina and Great American. Trefina, a Swiss corporation, claims that it acquired all of O'Neall's 5% interest by assignment. Great American, a corporation chartered in the Bahama Islands, makes a similar claim as to the 5% that was originally due to Dillin. The Internal Revenue Service is insisting that the purported assignments by O'Neall and Dillin are not bona fide, but are mere subterfuges created for the purpose of helping O'Neall and Dillin evade payment of income taxes they justly owe the United States. The cir-cumstances attending the purported assignments were such as to furnish substantial basis for the claim. If Trefina and Great American were not in fact owners of the interests covered by their purported assignments, there was no litigant with standing to contest Diaz' ownership of the two 1% interests in question.

(5) Both O'Neall and Dillin were citizens of the United States, Texans by birth, and lawyers by profession. Dillin was practicing in Corpus Christi, Texas, and O'Neall, in Washington, D. C., at the time they got the acknowledgment from Southeastern of their respective interests in the commissions. When it became apparent that the commissions were going to run into large figures, O'Neall and Dillin, by mere co-incidence, abandoned their residences in the United States without accounting for their income taxes, and fled to the Bahama Islands, that well known haven for United States citizens with income tax troubles. They have not dared to come back to the United States since leaving in the early 1960's. Lawyers for Trefina and Great American make the lame excuse that the interests of O'Neall and Dillin in international investments have been so consuming as to keep them abroad. However, those same lawyers stated that O'Neall and Dillin would not consider returning to this country for this trial unless this Court granted them complete immunity from any action which might grow out of their tax troubles. From statements in the brief filed by Trefina in support of its motion, there is some indication that O'Neall felt justified in trying to evade payment of income taxes to the United States, because the commission owners other than he and Dillin were residents of Argentina and were not going to have to pay such taxes.

(6) Dillin was content to make his purported assignment to a corporation chartered in the Bahama Islands, but O'Neall, the Washington lawyer particularly interested in international affairs, was not. He went to the place where it is common knowledge that the interna-

tional set goes when it has money to hide—to a Swiss banker. The banker had a corporation chartered as Trefina, A. G. for $12,500.00 under the laws of Switzerland. O'Neall purportedly assigned all of his million dollar commission to that $12,500.00 corporation in return for a $10,000,000.00 line of credit he might need if he put over two or three international deals he was then working on. Trefina's Swiss lawyer, who was designated to bring the original assignment when Trefina finally became convinced that the Court was not going to let it get by with a copy, was the only witness who could shed any light on Trefina itself. He knew nothing about the transaction involving the assignment. He said that Trefina's business was merely acting as a broker in financing deals.[2] O'Neall, then, was assigning his million dollar commission to a small corporation in return for its efforts in trying to broker the financing, if it should ever be needed. There was no provision for return of the commission, or any part thereof, in the event O'Neall did not get the deals

named in the assignment, or if Trefina was unable to negotiate the supposed $10,000,000.00 financing. Haemmerli said that the Swiss banker who owned Trefina was personally able to do the financing, but he was not obligated. If O'Neall was looking to him, the question arises as to why the banker was not required to guarantee the contract.

(7) Dillin purportedly assigned his commission after he had received substantial payments from Southeastern. Great American says that it was calculated that at least $250,000.00 more was to be paid on that part. Great American offered in evidence a check for $100,000.00 which it claimed represented the consideration it paid Dillin for the assignment. Dillin said in his deposition that Great American paid him $150,000.00.[3] The question immediately arises as to whether the $100,000.00 check was for evidentiary purposes in later income tax proceedings, and the $100,000.00 was kicked right back under the table by Dillin to Great American. It hardly seemed likely that he would miss the amount by 50%. Also, the

2. The following testimony was given by this witness, Haemmerli, during the time he was on cross examination by counsel for Diaz:

"Q Trefina, A.G. is really a mortgage brokerage house as we know it in the United States?

"A Well, I would call it a finance company, specializing in arranging financing deals.

"Q But Trefina, A.G. puts none of its own money into the thing, or if it does, it is a very limited amount of money, is that right?

"A I don't know.

"Q You are their lawyer, are you not?

"A Yes.

"THE COURT: Don't argue with him. Let me ask the question. When you say they arrange financing, you mean they take the deal and then go—

"A —Yes—

"THE COURT: —To somebody that has the money?

"A Right.

"THE COURT: And get them to put up the money, is that correct?

"A Yes.

"THE COURT: Sir?

"A Yes.

"Q (By Mr. Rosenberg) And they get a brokerage commission, is that what it is?

"A Yes."

3. The following occurred while Hazeltine, the witness brought here by Great American to identify the signatures on its assignment from Dillin, was on direct examination by Farrell Smith, counsel for Great American:

"MR. FARRELL SMITH: Yes, sir. This will be the defendant's next exhibit. And this is the check. And is that your signature on the bottom of that $100,-000.00 check?

"A It is.

"Q In Nassau, at the taking of Mr. Dillin's deposition, while I am not positive, it seems like he said $150,000.00 was the consideration, or there is some confusion on that. Could you shed any light on it?

"A Originally Mr. Dillin, when we were negotiating, asked for $150,000.00.

"Q I see.

"A When the deal was finally transacted, the figure was $100,000.00."

question arises as to why he would be willing to take only 40% or less of the balance then recognized to be due on an interest as good as his was. There is no indication that he was hurting financially. If he was hard up, would he have thought he got $150,000.00 for his interest when he got only $100,000.00?

(8) The Internal Revenue Service has made income tax assessments against O'Neall for more than $700,000.00, and against Dillin for more than $400,000.00, based on the amounts Southeastern has paid on their respective interests.[4]

(9) Trefina and Great American made every effort to suppress any information regarding the assignments. At one place O'Neall contributed his part to the suppression. Some of the efforts were direct and flagrant violations of orders of this Court. The following are some examples:

a. Although Trefina was supposed to have received its assignment on February 20, 1959, information about it never came to light until somebody had to appear and contest Diaz' claim of his 1%

assignment from O'Neall. The purported assignment to Trefina came to the surface when Trefina filed its plea of intervention in this cause on April 6, 1967, over eight years after the date of execution shown on it. During that period $672,800.00 was paid by Southeastern to O'Neall.[5] Great American's purported assignment, likewise remained a secret for years.

b. When O'Neall's deposition was being taken in the Bahamas in November before the case was to come to trial in February, he refused to permit anyone to see his copy of the assignment on the ground that no issue had been made as to the validity of it in the pleadings in this case.[6] That action was taken by a witness who was supposed to have disposed of his interest in the subject matter of the assignment over eight years before. Up to that time, counsel for Diaz had had no information about the assignments that gave any basis for suspecting their lack of genuineness.

c. When O'Neall declined to produce, counsel for Trefina and Great American

4. Trefina claims in its brief in support of its motion that such action "suggested a vindictive and punitive attitude by IRA toward O'Neall."

5. The contract between Southeastern and the various original owners of interests in the commission contained the statement: "Payments of the respective sums shall be made directly and individually by us to each of you." While such a provision might have meant that Southeastern would have insisted on making out its checks on the O'Neall interest to O'Neall, there was no restriction that would have prevented O'Neall from requesting that the check be mailed to him at an address of his choice. One of the puzzles in connection with the assignments is why each assignee did not require its assignor to execute a written request that the checks be sent to the payee in care of his assignee's office until advised to the contrary by a writing signed by both assignor and assignee. For instance, it would be assumed in a transaction of this kind between Trefina and O'Neall involving hundreds of thousands of dollars cash, that Trefina would have required that O'Neall execute written instructions to Southeastern to send his

checks to him in care of Trefina's office until notified to the contrary in a writing signed by both O'Neall and Trefina. Trefina's Swiss lawyer testified that O'Neall had no fixed residence and that he just travelled. O'Neall said in answer to written interrogatories that his residence was in the Bahamas. It is hard to conceive a situation where a corporation chartered and domiciled in Switzerland would permit an itinerant American who might just happen to be in and out of Switzerland occasionally to receive periodical payments at various places over the globe on a million dollar commission owned by it. A Swiss banker was the president and owner of Trefina, and Swiss bankers usually get credit for having more sense than that.

6. Mr. Garland Smith: " * * * Mr. O'Neall in his deposition on the record took the position that the pleadings admitted here the fact of the assignment and he declined to produce it. Of course, he is just a witness, he is not Trefina. * * * "

Note: By "deposition on the record", counsel was referring to a deposition recorded on tape only rather than in the usual manner.

agreed that they would secure the assignments from their respective clients and submit them for inspection by counsel for Diaz. Under those circumstances, the deposition taking in the Bahamas proceeded without any further effort on the part of Diaz to obtain the assignments. The depositions were concluded a short time before the end of the period agreed upon for discovery. The assignments were not produced as agreed, and Diaz promptly took additional discovery steps in early December to get them. Trefina and Great American responded with a motion to relieve them from compliance with the demands of Diaz, on the ground that the period allowed for discovery had just expired.

d. The matter relating to production of the assignments was presented to the Court at the final pre-trial hearing held in early January before the trial was to begin in February.[7] The Judge called attention to the fact that the pre-trial notices, the first of which had gone to counsel in the previous April, directed the parties to make all their exhibits available for inspection by their opponents.[8] He indicated that he was puzzled to know why a lawyer representing an assignee would not obtain the assignment for his own inspection prior to filing suit.[9] He was amazed to learn from the lawyers representing Trefina and Great American that their respective clients had refused to furnish them the assignments even though request for them had been made from the time they were employed. The originals of the respective assignments—O'Neall to Trefina, and Dillin to Great American—were ordered to be produced for inspection by counsel for Diaz not later than ten days before the date set for trial. The remarks the Court made in connection with the order were such that there ought not to have been any question about the Court's conviction that there should be a full disclosure by each side.[10]

---

7. Several preliminary pre-trial hearings had been held beginning with one on the previous April 6th.

8. The Court:
   " * * * I cannot understand not having documents like these here. The first hearing we had in this case was last April, and here they are not available at pre-trial."
   " * * * The complete answer to all that is that the pre-trial notice you got directed you to have all exhibits available to the other side."

9. When this matter came up again during the trial, the following occurred:
   "The Court: Do you think that where you brought suit based on an assignment and that was the only right you had in it, that it ought to be somebody else's responsibility to dig up the assignment, or do you think you ought to have it from the start?
   "Mr. Garland Smith: Should have it from the start, Your Honor."

10. "The Court: If there is any exhibit— I do not care what you have done or what you think about it—*any of you*— I am a crank about this matter of submitting the exhibits to the other side at an adequate time before trial for them to make inspection of them that will mean something; and if they are not submitted ten days before the trial, you can forget them unless they are admissible solely for the purpose of impeachment; and if you decide you are going to use them for impeachment, that does not mean you can come in the back door. You just take your life in your hands and run the risk of my ruling it inadmissible, because I do not believe in lying behind a log in cases like this; so you can just make up your mind you are going to get it here. * * * "
   "The Court: All right, I am going to require it. It always makes me think —when somebody holds back, it always makes me think something is wrong. So, both of you can just bear that in mind, you are going to try this case before me and I believe in laying the cards on the table. I do not believe in lying behind a log on anything, and if you cannot win this thing by coming out—*either side here*—and just saying, 'Here is what we have, we are willing for you to see it,' then you are going to be in bad shape before me, I will tell you that. * * * "
   "The Court: Well, we are all in a good humor about this thing now, so you understand, though, I am going to be pretty firm about that proposition. It is just nothing but right at this stage of the proceedings that you let the other side see all your exhibits."

e. On the morning of February 5th, the day the case went to trial, the lawyers in the case requested a conference with the Judge in chambers before any proceedings were had in the courtroom. Such conference was held with all such parties present. It was there made known to the Judge that neither Trefina nor Great American had complied with the Court's order at pre-trial that the original assignments be made available to counsel for Diaz at least ten days before the trial. Great American had produced its assignment only a few days before the trial, after Diaz and his expert witness on Argentine law were already on their way from Buenos Aires to Dallas.[11] Trefina had not furnished its original assignment at all,[12] and prospects for getting it appeared rather dim at that time. As usual, counsel for Trefina had a weak excuse, and the one offered at this point could not have been any weaker. He said that his company thought O'Neall got the original and it got only a Xerox copy. That an assignee of a collectible million dollar claim would not have an original of the foundation instrument on which its claim was predicated was as amazing to the Court as the fact that neither Trefina nor Great American would let their own lawyers see the original assignments and the fact that Trefina would let a promoter[13] (O'Neall) collect $672,800.00 that belonged to it while he was running around over the globe. The Court said in response to this excuse: "You can't help but understand how I would look at anything like that with a fishy eye."

The Court concluded this phase of the conference with the statement: "Of course, I do not approve of this business of lawyers not paying any attention to the instructions of the Court and I will take up that matter later."

f. Trefina went the limit before it produced the original. In spite of the fact that it had been warned by the Court at the pre-trial hearing that a copy of the assignment could not be introduced unless the original was produced, it tried on Wednesday of the first week of the trial to prove the purported assignment without having accounted for the original. It was only after the Court had excluded such secondary evidence that it became convinced that it had to produce. The original which had been impossible to find up to that time showed up when it was needed to make out Trefina's case. Trefina's Swiss lawyer brought it to Court near the close of the trial.[14] He knew little about it or the transaction out of which it grew. The only testimony he could give was to identify the signatures, just enough to lay the predicate for its admission in evidence.

g. Trefina and Great American did not attempt to bring any witness who had enough knowledge about the assignments and the transactions involving them to give any light on the question of their genuineness. Each one of them furnished a witness who knew only enough about the signatures on the documents to get them in evidence.

(10) The conduct of Trefina and Great American deprived counsel for

---

11. That Great American had had adequate notice is evidenced by the statement of its attorney to the Court at the pre-trial hearing on the previous January 10th:
"MR. FARRELL SMITH: Yes, sir, two days ago I called Nassaum long distance and asked that it be sent to me because it was requested, and it is probably on the way."

12. Trefina likewise had had adequate notice. At the pre-trial hearing, its counsel told the Court that, " * * * we have advised them already that if the Court requires the assignment, we will have it."

13. Trefina's lawyer, in the argument on this motion so identified O'Neall when he said "a promoter such as O'Neall".

14. Haemmerli apparently did not understand much about the situation, but he had got the impression some way that the original was not to be made available for the trial. When he met counsel of record for Trefina here, he apologetically told him that in his haste to make his plane, he had picked up the original instead of the copy he was supposed to bring.

Diaz of any opportunity to investigate the genuineness of the assignments. If the documents had been produced at least ten days before the trial, counsel for Diaz would at least have had an opportunity after seeing them to ask for a postponement of the trial for further discovery. By the time Great American finally produced its original, Diaz had lawyers from Washington and New York in Dallas, and he was on his way from Buenos Aires with his expert witness on Argentine law. The expense incurred by that time was so great that he could not afford to ask for a postponement.

(11) The oral depositions of O'Neall and Dillin [15] were taken in the Bahama Islands in November before the case was to come to trial in February. By agreement, they were recorded on tape rather than by the usual method.[16] Arrangements were apparently made jointly for an official tape, and separately, by Diaz on the one hand and Trefina and Great American on the other, for independent tapes of their own. For some reason the one Diaz got was so incapable of being understood that it was of no use. At the time the depositions were taken, Great American got the original tape and agreed that it would be produced in Court for the trial. It never got there, and no satisfactory explanation was given for its absence.

(12) As was said in the discussion of the question of indispensable parties, counsel for Trefina and Great American stated that they could and would secure and file disclaimers from O'Neall and Dillin to take out of the trial the question raised by Diaz about the lack of indispensable parties.[17] Counsel for Great American did file an instrument purportedly signed by Dillin; but, as has been pointed out before, it was so full of loopholes [18] that it bore little resem-

---

15. The depositions of O'Neall and Dillin were also taken in the Bahamas at another time on written interrogatories prepared by Trefina and Great American. Any practitioner knows what can be done under such circumstances, especially where the witness is testifying at a place where he is not subject to the perjury laws of this country. The questions are available to the witness in advance. Usually, under circumstances such as existed in this case, they are prepared with the help or advice of the lawyer and then filed. It is also possible to go over the answers to the interrogatories shortly before the witness is to give his answers. Most lawyers regard depositions of an interested witness on written interrogatories as the least dependable of all methods of getting at the truth.

16. The reason for this is not clear. It was certainly to the advantage of O'Neall and Dillin not to have to sign anything. However, the method used and the results obtained may have been due to the lack of a competent reporter in the area and to inadequacy of facilities.

17. "THE COURT: Let me ask you this. Any time you have a question like this, it is better to take it out of the case if you can. Aren't you all on friendly terms with O'Neall and Dillin?

"MR. FARRELL SMITH: Yes.

"MR. GARLAND SMITH: Oh, yes.

"THE COURT: Why can't you get disclaimers from them?

"MR. FARRELL SMITH: No question about O'Neall and Dillin.

"MR. GARLAND SMITH: We haven't had a chance to contact our clients since they came in with this. But they will disclaim.

"THE COURT: Well, get disclaimers from them then and that will take the question out of the case. You don't want a question like this in a case involving a small amount of money, much less a great amount of money.

"MR. GARLAND SMITH: Our clients are forced into the position of having close relationships with O'Neall and Dillin because they are the only witnesses we have got. I am sure neither one of them will have any objection to entering disclaimers."

18. The loophole tactics on the part of the assignees started in the preliminary proceedings and never terminated. In the conference in chambers before the beginning of the trial, the Court remarked, "I do not know what you can do, but everything Farrell Smith has presented has had a loophole in it." Of course, it is difficult to explain matters of this kind because ordinarily they require a detailed discussion. However, the following example, taken from the proceed-

blance to a disclaimer. In spite of the assurances that there would be no trouble getting a disclaimer from O'Neall, none was produced, and no satisfactory explanation was given for the failure to produce.

(13) O'Neall signed in two places on the instrument which Diaz claims assigned a 1% interest to him. When his deposition was taken, he said he could not remember signing in one of the places and would not identify one of his signatures. Diaz was put to the expense of having the signatures examined by a handwriting expert. When Trefina found out that Diaz was in position to prove the genuinness of both signatures, it agreed to stipulate that they were genuine. While it was difficult for the Court to conceive the trouble O'Neall had identifying his signature on a document that involved about $190,000.00, this matter might not have been as significant, standing alone, as it was when considered in connection with all the other cover-up tactics relating to the purported assignments to Trefina and Great American.

(14) In his efforts to get admissions from Trefina as to material matters, Diaz served on Trefina certain requests for admissions. Trefina responded in loophole fashion. It did not reply under oath as required by the rules. Its only response to the request for admissions was the following unsworn statement: "Trefina, A.G., an intervenor herein, hereby answers the requests for admission of fact served by plaintiff, Antonio A. Diaz, on Garland F. Smith, attorney for the intervenor, as set forth on the affidavit attached hereto and signed by Charles Ford O'Neall, and Trefina, A.G. hereby adopts the answers so made for the reason that the said O'Neall has personal knowledge of the facts stated, whereas the officers of Trefina, A.G. have no personal knowledge thereof." As would be expected, the affidavit of O'Neall was unfavorable to Diaz. Counsel for Trefina, apparently in all seriousness and with a straight face, tried to get this hearsay, self-serving statement of O'Neall in evidence through the back door by offering this affidavit. It was not admitted.

Many other instances could be cited to show the basis for the Court's comments out of the presence of the jury about skullduggery.[19] However, this memorandum is already too long, and the instances set out are enough to show that the Court was confronted with a course of conduct not to be reasonably expected in a modern day federal court trial where the emphasis is on disclosure rather than concealment. The Court felt that if Trefina and Great American ac-

ings during the trial, is brief and self-evident:
"MR. FARRELL SMITH: I will stipulate that as far as I know—
"THE COURT: —I beg your pardon—
"MR. FARRELL SMITH: —We had no notice sent to Mr. Diaz. At least, I search the file and I didn't see one, unless I am in error.
"THE COURT: I don't know whether that kind of a stipulation amounts to anything or not. You stipulate that as far as you know, no notice was sent. That is an 'Oklahoma' stipulation. The fact that you would have to stipulate to mean anything is whether or not any such letter was sent.
"MR. FARRELL SMITH: Well, what is in the file is correspondence between Mr. Weinstein, as attorney for Mr. Diaz, discussing various matters.

"THE COURT: Well, now, you are not stipulating. you are testifying, and you are not under oath, subject to cross examination.
"MR. ROSENBERG: Your Honor, we offer to stipulate no notice was ever sent to Diaz.
"THE COURT: Do you so stipulate?
"MR. FARRELL SMITH: No, I won't stipulate to that, because they have lawyers and obviously had some notice."

19. They appear in the pre-trial hearings, preliminary and final, throughout the trial itself, and in the hearing on the motion under discussion in this order. The matters disclosed in the hearing on the motion show that the Court was most considerate of the attorney for Trefina who is now complaining, and that there is no basis whatever for his claiming that the Court was hostile toward him.

tually had good faith assignments from O'Neall and Dillin respectively, it would have been to the advantage of all parties —O'Neall, Dillin, Trefina and Great American—to make a full disclosure of all evidence relating to the assignments. If Trefina and Great American actually got the money that was paid by Southeastern to their respective assignees, O'Neall and Dillin, it should have been easy enough to prove. Large amounts of money like $572,800.00 do not change hands without substantiating records. All O'Neall and Dillin ever had to do was to show that they actually delivered the commission money to their respective assignees without reservation. When that was shown, O'Neall and Dillin could have come back to the United States without anything to fear on account of income tax problems. Certainly, where the only contestants of Diaz' claim to the two later acquired 1% interests were Trefina and Great American, Diaz had a right to know the evidence that gave them standing to make the contest in time to do something about it. He had a right to inquire into whether there were any other agreements, oral or written, that should be considered in connection with the assignments; whether the assignments were in fact only security for loans; whether there were any reservations; whether there were any kickback agreements; and whether there were any other facts that would show that the assignments were not bona fide. The tactics employed by Trefina and Great American, and by O'Neall himself, prevented that kind of inquiry. The failure of Trefina and Great American to have the original assignments available for examination at least ten days before the trial also put Diaz in position where he could hardly ask for a continuance to give himself more time to pursue discovery after seeing the documents. The fact that Trefina and Great American would not even let their own lawyers see their assignments until the Court forced their hands, and the fact that they failed to produce the witnesses who could shed the most light on the transactions involving the assignments show how determined they were to suppress the facts.[20]

The remark of the Judge out of the presence of the jury that Trefina and Great American had a bad break when they drew him for a judge merely meant that they had got one who had strong convictions against suppression of evidence and a determination to see that all available, relevant evidence was produced at the trial. That is shown by the very context on which the remark was made:

"* * * You just had a bad break when you got me for a case like this. I believe in laying things on the table, open and aboveboard. I do not believe in covering up. I believe in just trotting it out for everybody to take a look. * * *"

The parties had already been told at pre-trial that this Judge was "a crank" about submitting the exhibits to the other side an adequate time before the trial for an inspection of them to mean something. The Court concluded his remarks on pre-trial about a full disclosure with the statement, "Well, we are all in a good humor about this thing now; you understand, though, I am going to be pretty firm about this proposition. * * *"

The Court would have been justified in imposing severe sanctions on Trefina and Great American for failure to obey its discovery order. He probably made

20. This attitude has not changed. After this trial, the Court permitted the government to file a plea of intervention on its tax claims against O'Neall and Dillin, and made O'Neall and Dillin parties to this action. The government took proper steps to take the deposition of the President and owner of Trefina, but he failed to show up on two occasions. Finally, Judge Taylor, in whose court this case is actually pending, on motion by the government, granted a default judgment in favor of the government as to Trefina declaring that the government's claim to the O'Neall commission was superior to any claim Trefina might assert.

a mistake by not dismissing each of the pleas of intervention; but he felt that such action should be taken only as a last resort. He did not know their lawyers, and decided to hear all the evidence before deciding whether it was the lawyers or their clients who were at fault. It appears to have been the clients, as the attorney for Trefina told the Court after the original assignment was finally produced, in substance, "You do not know the trouble I have had in getting this document here."

Trefina and Great American cannot claim that the Court's firmness about disclosure was applied only to them. His remarks at the pre-trial hearing were addressed to "any of you" and to "either side here".[21] The first time this matter of failure to produce an original document for inspection came up was at the beginning of the final pre-trial hearing on January 10th. At that time, Garland Smith, counsel for Trefina, contended that Diaz had not furnished for inspection the original of the instrument by which Diaz claimed O'Neall had assigned a 1% interest to him. Counsel for Diaz argued that he had provided Smith with a Xerox copy, and Smith insisted on inspecting the original. The Court instructed counsel for Diaz to make the original available for inspection before the end of the following week.[22] That was done before any question came up about the production of the originals of the assignments. Again, during the cross-examination of Diaz by counsel for Trefina, Diaz refused to answer a question. The Court compelled him to answer by telling his counsel out of the hearing of the jury to advise him during recess that he had to answer, and that he would be held in jail until he did if he refused.[23]

---

21. See footnote 10.

22. "MR. GARLAND SMITH: For the purpose of your secretary, I am Garland Smith, representing Trefina. There is one question here that I don't think it is confusing, but we received in evidence— that is, we mentioned the letter of March 30, 1959, which is the document that Diaz contends is an assignment and we contend is a power, and there is some contention between the parties as to whether that document was a two page document with a notarization, or simply a letter. Now we have not yet seen here the original document.

"THE COURT: Where is it?

"MR. GARLAND SMITH: We are informed a handwriting expert has it, and we don't question it except to say it is received in evidence. We do not concede necessarily that the one they had is the document that was actually signed, nor do they concede our contention is right. I don't know how to handle that, but we do want to have a reservation with respect to that.

"MR. ROSENBERG: Your Honor, they have received a Xerox copy.

"THE COURT: They are entitled to the original.

"MR. ROSENBERG: No question about that. Of course, Mr. O'Neall denies his signature was on the first page as a witness because the Argentine notary said it was his signature we decided we should send the original to a handwriting expert. He is keeping it only for the purpose of the trial.

"THE COURT: Is he through with it?

"MR. ROSENBERG: The only thing I think Mr. Smith contends if the second page is not the page with the handwriting on it, but the page with the notarization.

"MR. GARLAND SMITH: Of course, the copies we have received, those signatures and everything were just practically illegible and the same is true with respect to one we submitted. We had thought we could get correct copies from Southeastern where it shows the signature illegible, which was true with respect to the verifax copies we have received.

"THE COURT: All right. Anyway, get it back. They are entitled to see the original and unless the question is settled—

"MR. ROSENBERG: —We will get it back from the handwriting expert.

"THE COURT: Get it back before the end of next week—before Friday of next week."

23. "MR. GARLAND SMITH: Your Honor, we believe in this case the witness should be instructed to give the names of these officials. I do not believe a privilege exists in this case.

"MR. ROSENBERG: I don't think the names make one bit of difference, Your Honor, and we are talking about—

"THE COURT: —Come up here.

"(THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH

A complete answer to the whole contention of Trefina is that counsel for Great American had just as much ground to complain as counsel for Trefina did, and that while the jury found against Trefina, it found in favor of Great American. The motion says that "the Court instructed counsel for Trefina and Great American that he would have something to say to them about this matter immediately upon the conclusion of the case. The firmness of the Court about compliance with its discovery orders and about full disclosure, and the remarks made in connection therewith, applied with equal force to Trefina and Great American. If the jury had had any idea that the Court was trying to favor Diaz, and if it had been influenced by such conduct, it would have returned a verdict against Great American as well as Trefina.

While the remarks above discussed were made out of the presence of the jury, Trefina's motion says that it was "denied its constitutional right to a trial of the facts by an impartial jury" on account of unfair comments by the Court on the weight of the evidence which were "unfairly beneficial to Diaz and of such a nature as to deny the jury the free exercise of their judgment." The answers of the jury to the interrogatories submitted show that the jury acted independently in reaching its decisions, just as the Court had instructed it at the conclusion of the charge to do.[24]

As far as remonstrances in the presence of the jury were concerned, plain-

OUTSIDE OF THE HEARING OF THE JURY)

"THE COURT: I am going to give you a ten minute recess to talk to him and explain to him that he will have to answer that question, and that if he does not, he will be in contempt of Court and subject to being imprisoned until he does answer it. He will be held here in jail until he does answer.

"MR. ROSENBERG: Your Honor—

"THE COURT: —He is here and he brought this lawsuit. He is the one who brought it, and this is a part of the transaction and he cannot decide what information he is going to give.

"MR. ROSENBERG: I don't think— Your Honor, may I just say something?

"THE COURT: All right, say it.

"MR. ROSENBERG: I don't think he wants to hide anything. No question about that.

"THE COURT: I don't care what his position is. He was asked the question, and they are entitled to an answer.

"MR. ROSENBERG: In Argentina, it is different. It is not for him but—

"THE COURT: —He ought not to have brought the lawsuit if he did not want to give full information about all material facts. So he has got his choice, he can dismiss it or give this information. And I will give you ten minutes to talk to him.

"(THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT WITHIN THE PRESENCE AND HEARING OF THE JURY).

"THE COURT: We will recess for ten minutes.

"(A SHORT RECESS WAS HAD)

"THE COURT: Ask the question again.

"MR. ROSENBERG: He is going to answer it."

24. "You are the exclusive judges of the credibility of the witnesses and of the weight to be given the evidence. It is your own independent responsibility to determine those matters and to determine your answers to the questions that are submitted to you in the light of the Court's instructions.

"Any opinion that the Court has about the credibility of the witnesses, the weight to be given the evidence, and about your findings on these issues is not binding on you. As I told you in the beginning, if I were on the jury I would make my own independent decision about those matters. We cannot have a trial by jury unless the jury gives its own independent decision. If I were on the jury, I would certainly try to see that the decision that I turned in, or joined in turning in, represented my own independent decision, regardless of what the Court or anybody else thought about it. The only thing you are bound by insofar as my part of it is concerned, is the charge of the Court on the law. You are bound by my instructions on the law, but you are not bound by any comments here that I may make on the facts. That applies to everything I have said or done up to this time, and everything I may say or do from now until the time your verdict comes in."

Note: This instruction should be considered in connection with the one quoted in footnote 25.

tiff's counsel had more to complain about than those representing Trefina and Great American. That was because one of plaintiff's able counsel had a low boiling point and let his feelings get the better of him on a few occasions. He had to be called down firmly a couple of times in the presence of the jury, while the remonstrances about which Trefina complains were out of the jury's presence. It was primarily because of the restraint that the Court had had to use on one of plaintiff's counsel that he gave the instruction in the main charge shown in the footnote below.[25]

Since only the rough spots in the trial are included in this summary, a person not reading the entire record might get the impression that there was constant antagonism between the Court and counsel. The contrary is true, because on the whole the trial went along smoothly. Usually, only one or maybe two of the kind of incidents set out herein occurred in a whole day of trial, and most of them were out of the presence of the jury. This was the kind of a case where the Court did have to keep a tight rein to prevent things from getting out of control. Partners in a large deal had fallen out and had become bitter towards each other. The stakes were high. Trefina and Great American were accusing Diaz, one of the most prominent citizens of Argentina, with having bribed Argentine public officials in high places. The lawyers involved were able and aggressive. There were times when they reflected the feelings of their clients. But, taken as a whole, the trial progressed on an even keel, even though the Court was determined that all available, relevant evidence should be produced at the trial and Trefina and Great American were equally determined to suppress as much as possible.

Trefina's motion to dismiss or for judgment will be overruled.

---

25. "Before I go on and close the charge, I do want to make it clear to you that you should not take into consideration any admonitions I have had to make to the lawyers in the case. Lawyers are advocates. They get the feeling their clients have. You are bound to know that because of these charges in this case there is a lot of bitterness. Sometimes the lawyers are so close to the clients that the feeling rubs off on them, and they get · worked up. They have got to be pretty partisan to be effective and to represent their clients right under our adversary system. But at any rate, you ought not to take into consideration anything I have said along that line, any firmness I have had to show to hold this thing on an even keel. You have a lot higher duty than to decide this thing on the basis of a game. It is not a game. It is your duty to tell what the truth is here on these questions that I have asked you, and that ought to be decided on the basis of the evidence, whether you agree with me about my admonitions of the lawyers or not. Their conduct is not evidence at all. We must get right down here to the truth about the situation, in the light of the evidence you have heard, and in the light of the instructions I have given you. The message I am trying to get over to you is that insofar as you and I are concerned, we are trying the rights of the litigants. We are not trying the lawyers."