449 F.2d 258
 Antonio A. DIAZ, Plaintiff-Appellee-Cross Appellant, and
Great American Investment Company, Plaintiff-Cross Appellee,
v.
SOUTHEASTERN DRILLING CORPORATION OF ARGENTINA, S.A., et al., Defendants, and
Trefina, A.G., et al., Intervenors-Appellants.
 No. 28641.
 United States Court of Appeals, Fifth Circuit.
 September 17, 1971.
 
 William D. Donnelly, Washington, D. C., for Trefina, A. G., and others.
 Warren E. Zimmerman, Arthur S. Goldberg, Dallas, Tex., Harvey Rosenberg, Silver Spring, Md., Goldberg, Alexander & Baker, Dallas, Tex., for appellee Antonio A. Diaz.
 Farrell D. Smith, Corpus Christie, Tex., Dennis Cassell, Mike Joplin, Dallas, Tex., for Great American.
 Before COLEMAN, AINSWORTH, and GODBOLD, Circuit Judges.
 COLEMAN, Circuit Judge:
 
 
 1
 The decision of the District Court is reported, Diaz v. Southeastern Drilling Co. of Argentina, S. A., 324 F.Supp. 1 (N.D.Tex., 1969). See, also, Diaz v. Southern Drilling Corp., 5 Cir., 1970, 427 F.2d 1118.
 
 
 2
 We see no necessity for a repetition in this appellate opinion of the facts as reported in the decision below. The controversy may very simply be stated.
 
 
 3
 Antonio Diaz claimed that Charles F. O'Neall and W. N. Dillin, by separate instruments in writing, executed at different places and times, had each assigned to him one-fifth (1/5) of certain sums admittedly due originally to each of them under a contract previously made with Southeastern Drilling. Trefina, A. G., a Swiss corporation, contended, however, that O'Neall had sold to it all his interest in the subject contract. Great American Investment Corporation, a corporation organized in the Bahama Islands, made a similar claim as to Dillin's interests. Both Trefina and Great American contended, of course, that the purported letters or instruments to Diaz were invalid as assignments, leaving them as the true owners of the interest in controversy. So, the issues were plain — did any part of these allegedly assigned interests belong to Diaz or to Trefina or to Great American?
 
 
 4
 For the reasons reported, 324 F.Supp. 1, supra, the District Court held as a matter of law that the issues presented were controlled by Argentine law. Applying that law, Rule 44.1 Federal Rules of Civil Procedure, it was further held that the letter from O'Neall to Diaz, dated March 30, 1959, was a valid assignment; that the letter from Dillin to Diaz was a revocable power of attorney, which had been revoked. The result was a judgment for Diaz as to the O'Neall interests and for Great American as to the Dillin interests, from which Diaz has appealed as to Dillin and Trefina has appealed as to O'Neall. We affirm on both appeals.
 
 
 5
 The appeals have been treated to extensive oral argument. The voluminous record has been subjected to prolonged consideration.
 
 
 6
 We agree that Argentine law controlled and that Argentine law was correctly applied.
 
 
 7
 Our agreement specifically includes the holding below that O'Neall and Dillin, in the posture in which the case was presented, were not indispensable parties to the litigation, see 324 F.Supp. at page 7.
 
 
 8
 There was, however, an additional issue in the trial below. It was urged that O'Neall's assignment dated March 30, 1959, was made for the purpose of supplying funds with which to bribe certain Argentine officials. If true, this would have rendered the assignment null and void under Argentine law. In response to a special interrogatory, appropriately propounded, the jury found against these contentions.[1] Trefina attempted to prove that the official in question was an individual by the name of Arturo Sabato. There was evidence to support the contention, had it been accepted by the jury. In the main, the substance of it was that a code name [Carter] used by the parties in their negotiations was, in fact, Arturo Sabato. At the trial, Trefina called Tom B. Rhodes, General Counsel for Southeastern, as a witness. On direct examination, the following, inter alia, occurred;
 
 
 9
 "Q (By Mr. Garland Smith) Mr. Rhodes, do you know Dr. Arturo Sabato, the former head of the YPF, Argentina?
 
 
 10
 A Yes, sir. I am not sure he is the former head, but he was one of the high officials in YPF. Yes, sir, I know him.
 
 
 11
 Q You know the one that was called Dr. Arturo Sabato?
 
 
 12
 A Yes, sir, I do.
 
 
 13
 Q What were the circumstances of your first meeting him. When and where did you first meet him?
 
 
 14
 A I believe I met him in Argentina, probably about 1960. We were down there many times and I met him on several occasions. Probably first about 1960.
 
 
 15
 Q Did you meet him in his office?
 
 
 16
 A I believe I met him in the hall the first time, in the YPF building.
 
 
 17
 Q What building?
 
 
 18
 A The YPF building, office building.
 
 
 19
 Q Did Mr. Arturo Sabato ever come to your office in Dallas?
 
 
 20
 A Yes, sir.
 
 
 21
 Q About when would that be?
 
 
 22
 A I believe it was — oh, several years ago. Probably around 1963.
 
 
 23
 Q Did he state the purpose of his visit?
 
 
 24
 MR. ROSENBERG: Objection, Your Honor.
 
 
 25
 THE COURT: On what grounds?
 
 
 26
 MR. ROSENBERG: Anything he said would be hearsay.
 
 
 27
 THE COURT: Sustained.
 
 
 28
 Q Do you know what the purpose of his visit was?
 
 
 29
 MR. ROSENBERG: Objection, Your Honor. He doesn't know of his own personal knowledge.
 
 
 30
 THE COURT: Was Diaz connected with that visit? Was he there?
 
 
 31
 A No, sir.
 
 
 32
 THE COURT: Sustain the objection.
 
 
 33
 Q Did Mr. Diaz — I mean did Mr. Sabato, was he by himself or anyone else with him?
 
 
 34
 A I believe he was by himself.
 
 
 35
 MR. GARLAND SMITH: May I approach the bench, Your Honor.
 
 
 36
 THE COURT: Yes, sir.
 
 
 37
 (The following proceedings were had at the bench outside of the hearing of the jury)
 
 
 38
 MR. GARLAND SMITH: Your Honor, we would offer to prove by this witness, and I don't think it ought to be brought out in the presence of the jury, in view of your ruling, that he did come by and for the purpose of determining if any money had been left here for him.
 
 
 39
 THE COURT: Sabato?
 
 
 40
 MR. GARLAND SMITH: Yes, and the purpose would be to impeach the testimony of Mr. Diaz, and it would be admissible for that purpose. We would offer to prove that by this witness.
 
 
 41
 THE COURT: My ruling stands. I could be wrong about that, but if I am, I do not know the law of evidence. I think it is one of the fundamental rules of evidence."
 
 
 42
 Trefina now argues that this offer of proof contained nothing to suggest "that the words of Arturo Sabato were to be used testimonially as assertions to evidence the truth of any fact asserted", hence should have been admitted on the bribery issue, at least as a verbal act. We note, however, that Sabato was not a party to the litigation and had not been called as a witness subject to cross examination. The visit occurred about four years after the assignment was made. None of the parties to the assignment, or to the litigation, was present. None was mentioned. No assignment or drilling contract or agreement or document was mentioned; neither is there any mention of the reason for an expectation that "the money" might have been left by somebody, we know not who.
 
 
 43
 The District Court held that this was hearsay, that if it was not, then "I do not know the law of evidence".
 
 
 44
 Again, we agree. Suppose Sabato, in like circumstances, had named names and had confessed bribery at the hands of Diaz or O'Neall. Would not this have been hearsay, unless and until he took the witness stand and testified under oath, subject to cross examination? We have no doubt that it would have been. See, e. g., Carantzas v. Iowa Mutual Insurance Co., 5 Cir., 1956, 235 F.2d 193; The Monarch of Nassau, 5 Cir., 1946, 155 F.2d 48; Dallas County v. Commercial Union Assurance Co., 5 Cir., 1961, 286 F.2d 388; United States v. Hicks, 5 Cir., 1970, 420 F.2d 814; Sabatino v. Curtiss National Bank of Miami Springs, 5 Cir., 1969, 415 F.2d 632, cert. denied 396 U.S. 1057, 90 S.Ct. 750, 24 L.Ed.2d 752.
 
 
 45
 Moreover, the issue on this point was whether Diaz and O'Neall intended the assignments to constitute a vehicle for bribery. The only possible purpose of the proffered evidence as to the unadorned and unexplained visit of the Argentine official, four years after the event, was to plant the suspicion that he had, indeed, been bribed, hence O'Neall and Diaz must have intended to bribe him. This cannot be saved under the "verbal act" doctrine by the assertion that the only purpose of it was to prove that the event had taken place, not to prove or assist in proving that bribery had been intended or accomplished.
 
 
 46
 One last point remains.
 
 
 47
 The Fifth Interrogatory to the jury was as follows:
 
 
 48
 "Do you find from a preponderance of the evidence that the two payments to Diaz of $2,380.95 by O'Neall and Dillin, respectively, on or about September 17, 1959, were made by them in recognition of Diaz' ownership of the two 1% interests in question?
 
 
 49
 "ANSWER: Such payments were so made."
 
 
 50
 The jury had already found, in answer to Interrogatory No. 3, that it was not Dillin's intention when he delivered the letter [claimed assignment] of July 8, 1959, that Diaz should have the proceeds thereof for his use for any purpose he saw fit, including his own benefit.
 
 
 51
 Diaz says that under Argentine law the payment, as found by the jury in Interrogatory No. 5, amounted to a confirmation that Dillin recognized and acknowledged Diaz to be the owner of the 1% (1/5 of 5%) interest purportedly assigned in the letter of July 8.
 
 
 52
 Hence, it is contended that the jury findings in response to Interrogatories 3 and 5 can be reconciled, that Diaz should recover as against Great American (Dillin) under the terms of the answer to No. 5. This issue was thoroughly considered by the District Judge, 324 F.Supp. 5, 6. He decided as a matter of Argentine law that the payment of September 17, 1959, could not constitute the confirmation of an assignment.
 
 
 Conclusion
 
 
 53
 This was, and is, a peculiarly difficult and nettlesome case. We perceive no reversible error in the way it was tried and decided below.
 
 The judgment of the District Court is
 
 54
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Question No. 2: Do you find from a preponderance of the evidence that at the time of the delivery to Diaz of the document dated March 30, 1959, identified as plaintiffs' Ex. 1-A, it was the intention of both O'Neall and Diaz that the proceeds of the 1% mentioned therein be used for the purpose of bribing any public official of Argentina?
 Answer: That was not their intention.
 A similar interrogatory, with the same answer returned, was propounded as to Dillin's letter of July 8, 1959.